# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| BRACE INDUSTRIAL CONTRACTING, INC. and PETERSON INDUSTRIAL SCAFFOLDING, INC., | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 11189-VCG |
| PETERSON ENTERPRISES, INC., RONALD A. PETERSON, ERIC PETERSON, KIRK PETERSON, RONALD A. PETERSON REVOCABLE TRUST, RONALD A. PETERSON 2010 IRREVOCABLE TRUST, and VERNON L. GOEDECKE COMPANY, INC., | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION

Date Submitted: August 1, 2016
Date Decided: October 31, 2016

Andrew S. Dupre, Michael P. Kelly, Benjamin A. Smyth, and Brian R. Lemon of McCARTER & ENGLISH, LLP, Wilmington, Delaware, *Attorneys for Plaintiffs*.

Robert A. Penza and Christopher M. Coggins, of POLSINELLI PC, Wilmington, Delaware, *Attorneys for Defendants*.

GLASSCOCK, Vice Chancellor

This matter involves the sale of a business unit from one of the Defendants (Peterson Enterprises, Inc.) to one of the Plaintiffs (Brace Industrial Contracting, Inc.). That unit, Peterson Industrial Scaffolding ("PIS"), provides "turnkey" custom scaffolding design, erection, and dismantling. The seller retained another business unit, Vernon L. Goedecke, Inc. ("Goedecke") that participates in the scaffolding *rental* business; the sale contract for PIS contained a covenant restricting the retained business.

The Plaintiffs have alleged that the Defendants have breached the restrictive covenant provisions, and have committed breaches of contract and fraud with respect to the sale. This post-trial Memorandum Opinion addresses the alleged breach of the restrictive covenants, and fraud or breach of warranty with respect to inventory the Defendants were required to transfer to the Plaintiffs under the sale contract. Remaining issues will be referred to a Special Master for recommended resolution.

## I. BACKGROUND

### A. *The Parties*

The Plaintiffs are Brace Industrial Contracting, Inc. ("Brace") and Peterson Industrial Scaffolding, Inc. ("PIS").[1] Brace "is a Delaware corporation that provides diversified and integrated industrial services within the power generation,

---

[1] PIS is now doing business as "Platinum Scaffolding." Prelim. Inj. Hr'g Tr. 4, Aug. 20, 2015.

agriculture, maritime, commercial, petrochemical, and oil and gas markets."[2]  PIS "sells scaffold, rents scaffold, erects and dismantles ("E&D") scaffold, designs scaffold layouts, and manages the deployment and use of scaffold assets."[3]

The Defendants are Peterson Enterprises, Inc. ("PEI"), Ronald A. Peterson, Eric Peterson, Kirk Peterson, Ronald A. Peterson Revocable Trust, Ronald A. Peterson 2010 Irrevocable Trust, and Vernon L. Goedecke, Inc.  PEI is a holding company that owns Goedecke.[4]  Ronald Peterson and his sons, Eric and Kirk Peterson, serve as Goedecke directors and officers of PEI.[5]

## B. The Acquisition

PEI owned PIS until August 10, 2014, when Brace acquired PIS from PEI for $18.7 million (the "Acquisition").[6]  PEI owned a scaffolding business in Angola, which was not a part of the Acquisition.[7]  The parties executed a series of contracts to consummate the Acquisition.  The parties entered into a Stock Purchase Agreement (the "SPA"), in which Brace agreed to purchase PIS from PEI, and a Transition Services Agreement (the "TSA").[8]  The TSA required the Defendants to

---

[2] Pretrial Stip. 4 (Mar. 18, 2016).
[3] *Id.* at 5.
[4] *Id.* at 4.
[5] *Id.* at 5.
[6] *Id.* at 5, 10.
[7] *Id.* at 5.  The Plaintiffs argue that since trial, the Defendants have "lost their Africa contracts." Pls' Post-Trial Opening Br. ("Pls' Opening Br.") 40.
[8] Pretrial Stip. 5, 6, 9.

manage aspects of PIS's post-closing business.[9] The parties also executed restrictive covenant agreements (the "RSAs") that prohibit the Defendants from engaging in the "Business" in the "Territory" for five years.[10] Finally, the parties entered into an "Escrow Agreement" and a "Guaranty."[11] The Escrow Agreement was entered into by Brace, PEI, and the Escrow Agent – Wilmington Trust, National Association.[12] Under the Escrow Agreement, ten percent, or $1.87 million, of the $18.7 million purchase price was placed in escrow.[13] The $1.87 million was scheduled to be released to PEI in equal halves on April 1, 2015 and February 10, 2016 if there were no claims for indemnification.[14] The Guaranty was executed by Ronald Peterson and the Trust Defendants who agreed to guarantee PEI's obligations to indemnify Brace under the SPA.[15] All of these contracts are governed by Delaware law.[16]

### C. The Restrictive Covenants

"The Restrictive Covenants are found in the RSAs and Section 5.2 of the SPA."[17] "The parties [have] stipulated that any breaches of the Restrictive

---

[9] *Id.* at 9.
[10] *Id.* at 8.
[11] *Id.* at 5–6.
[12] *Id.* at 5–6.
[13] *Id.* at 10.
[14] *See id.* at 10; Pls' Opening Br. 10–11; Defs' Post-Trial Opening Br. ("Defs' Opening Br.") 5, 47; Escrow Agreement 1.3(c), 1.4(a), 1.5(a).
[15] *See* Pretrial Stip. 6–7.
[16] *See* SPA § 7.8(a); TSA § 13; RSAs § 11; Escrow Agreement § 4.4; Guaranty § 6.3. The SPA is found in JX 70. The RSAs are in JX 67, 74, 75, 76, 77. The TSA is in JX 68. The Escrow Agreement is in JX 69 and the Guaranty is in JX 72.
[17] Pretrial Stip. 8; SPA § 5.2.

Covenants would cause irreparable harm and entitle the Plaintiffs to injunctive relief."[18] The Restrictive Covenants prohibit the Defendants from engaging in the "Business" in the "Territory" (the United States and Canada) for five years.[19] "Business" is defined as "the turnkey, integrated business of selling and renting industrial and commercial scaffolding and the provision of related design, engineering, erection, dismantling, and jobsite management and maintenance services."[20] The Restrictive Covenants include a "Carve-Out,"[21] as follows:

> [n]otwithstanding the foregoing, (1) Seller may own, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if Seller is not a controlling Person of, or a member of a group which controls, such Person and does not, directly or indirectly, own five percent (5%) or more of any class of securities of such Person, and (2) Vernon L. Goedecke Company, Inc. and its Affiliates may continue to design, engineer, sell and rent scaffolding equipment and other products to participants in the Business in the Territory, provided that Vernon L. Goedecke Company, Inc. and such Affiliates are not allowed to perform the Business in the Territory.[22]

The Plaintiffs filed a Motion for Preliminary Injunction ("Plaintiffs' Motion") on June 22, 2015.[23] Based on the language in the Carve-Out, the Plaintiffs sought

---

[18] Pretrial Stip. 9.

[19] *Id.* at 8 ("From the Closing Date until five (5) years after the Closing Date (the "Restricted Period"), Seller shall not, and shall not permit any of its Affiliates (including Vernon L. Goedecke Company, Inc.) to, directory [sic] or indirectly: (i) engage in or assist others in engaging in the Business in the Territory . . . .").

[20] *Id.* at 8; SPA Ex. A.

[21] The Defendants note they would prefer this language be referred to as "confirming language" rather than a "carve-out." *See* Defs' Opening Br. 11 n.3.

[22] Pretrial Stip. 8–9.

[23] Mot. for Prelim. Inj. (June 22, 2015).

4

to enjoin Goedecke's sale and rental of PERI UP brand commercial scaffolding to end users in the United States and Canada.[24]  I first addressed Plaintiffs' Motion in a hearing held on August 20, 2015 (the "Hearing").[25]  Although I found the language in the Carve-Out ambiguous, I found that the Plaintiffs satisfied the first prong of a preliminary injunctive relief analysis because there was a reasonable likelihood that the Plaintiffs would prevail on their construction of the contract, "which is that the [C]arve-[O]ut permits only rental and sale of scaffolding by Goedecke to those themselves in the business of providing scaffolding—that is, business-to-business sales and rentals—and does not carve out from the prohibition retail sales or rentals to an end user."[26]  Additionally, I found that the second prong of the preliminary injunctive relief analysis was satisfied because "the parties provided in the SPA that breach of the non-compete would entail irreparable harm and because the probable effect of competition on the goodwill purchased by the Plaintiffs made irreparable harm likely. . . ."[27]  Following the Hearing, I issued a Letter Opinion on August 28, 2015 addressing the remaining issues with respect to Plaintiffs' Motion.[28]  I found that in light of the fact that "Goedecke's revenue from worldwide PERI UP sales and rentals is only a quarter of its total scaffolding-business revenue . . .  and that

[24] *See Brace Indus. Contracting, Inc. v. Peterson Enterprises, Inc.*, 2015 WL 5097240, at *2 (Del. Ch. Aug. 28, 2015).
[25] *See* Prelim. Inj. Hr'g Aug. 20, 2015.
[26] *Brace*, 2015 WL 5097240, at *2.
[27] *Id.*
[28] *Id.* at *1.

5

[the preliminary] injunction [would] apply only in the Territory, and not worldwide," the balance of the equities favored the preliminary injunctive relief sought.[29] I granted Plaintiffs' Motion, pending trial, and found that $250,000 was sufficient surety for the Defendants should the grant of preliminary relief prove improvident.[30]

### D. The Inventory Claims

The inventory claims consist of the first four counts in the Amended Verified Complaint (the "Inventory Claims").[31] As part of the Acquisition, Brace purchased all of PIS's assets, including its scaffolding equipment, except for certain equipment agreed to be retained by Goedecke.[32] The parties stipulated that "[t]he conveyance of PIS's scaffolding equipment to Brace was an essential part of the Acquisition."[33] "PEI sold to Brace what PIS had been doing historically as it was operating at the time" of Closing.[34] PEI "purported to" list all assets PIS possessed at Closing, including scaffolding equipment, in Section 3.11(b) of the SPA Disclosures (the "Scaffolding List").[35] PEI represented and warranted in Section 3.11(b) of the SPA that:

---

[29] *Id.* at *2.
[30] *Id.* at *3.
[31] *See* Pls' Post-Trial Answering Br. ("Pls' Ans. Br.") 4; Defs' Opening Br. 23; Am. Verified Compl. 16–21. Count I is for Declaratory Judgment on the SPA and Escrow Agreement. Count II is for Breach of Contract for Fundamental Representations in the SPA. Count III is for Declaratory Judgment on the Guaranty and Count IV is for Fraud.
[32] Pretrial Stip. 6.
[33] *Id.* at 7.
[34] *Id.* at 6.
[35] *Id.* at 6.

Section 3.11(b) of the Disclosure Schedules sets forth a true, correct and complete list and general description of substantially all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones and other tangible personal property of the Company or used solely in the Business and not by the Seller for other purposes in connection with any Affiliates (the "Tangible Personal Property"); provided, the Company also regularly uses rented equipment from PERI USA, PERI Canada, and other third-parties for which the Company has no ownership claim.[36]

Under the SPA, PEI is required to indemnify Brace for "Losses" caused by breaches of PEI's representations and warranties.[37] On March 26, 2015, Brace sent a Notice of Direct Claim (the "Claim Notice") to PEI asserting that the Scaffolding List overstated PIS's scaffolding inventory and notifying PEI of its intent to seek indemnification under the SPA.[38] This claim prevented the scheduled disbursement of the $1.87 million held in escrow.[39] PEI rejected the Claim Notice in a letter dated April 13, 2015 and six months later itself asserted a Direct Claim for indemnification against Brace for alleged breaches of the SPA.[40]

### E. Procedural History

The Plaintiffs filed their initial complaint on June 22, 2015 and an amended complaint (the "Complaint") on August 20, 2015.[41] The Plaintiffs allege nine different Counts, broadly based on three main claims: that the Defendants are in

---

[36] *Id.* at 7; SPA § 3.11(b).
[37] Pretrial Stip. 7.
[38] *Id.* at 10.
[39] *See* Pls' Opening Br. 10–11; Defs' Opening Br. 47.
[40] Pretrial Stip. 10.
[41] Am. Verified Compl. (Aug. 20, 2015).

breach of the Restrictive Covenants,[42] the Inventory Claims,[43] and that the Defendants have usurped customer payments belonging to the Plaintiffs under the TSA (the "Customer Payments Claim").[44]

The Defendants answered the Complaint and simultaneously filed three counterclaims against the Plaintiffs on October 19, 2015.[45] In Counterclaim Count I, the Defendants seek a declaratory judgment that the Plaintiffs are not entitled to indemnification under the SPA. Instead, the Defendants seek in Counterclaim Count II a declaratory judgment that they are entitled to indemnification from the Plaintiffs for breaching the "Further Assurances" provision of Section 5.7 of the SPA.[46] Counterclaim Count III centers on the same "Further Assurances" clause and seeks indemnification for breach of contract.[47]

---

[42] Count IX.

[43] In Count I, the Plaintiffs seek Declaratory Judgment on the SPA and the Escrow Agreement. In Count II, the Plaintiffs claim a breach of contract under the SPA's "Fundamental Representations." In Count III, the Plaintiffs seek a declaratory judgment on the Guaranty. In Count IV, the Plaintiffs claim the Defendants committed fraud with respect to Fundamental Representations in the SPA.

[44] In Count V, the Plaintiffs alleged the Defendants are in breach of the TSA and allege in the alternative in Count VI that the Defendants are in breach of the implied covenant of good faith and fair dealing on the TSA. In Count VII, the Plaintiffs make a claim for conversion of the Customer Payments. Finally, in Count VIII, the Plaintiffs allege that the Defendants have been unjustly enriched from their usurpation of the Customer Payments.

[45] Defs' Ans. to Am. Verified Compl. with Countercl. 70, 72–73 (Oct. 19, 2015).

[46] See SPA § 5.7 ("Following the Closing, each of the Parties shall, and shall cause their respective Affiliates to, execute and deliver such additional documents, instruments, conveyances, and assurances and take such further actions as may be reasonably required to carry out the provisions hereof and give effect to the Transactions.").

[47] Defendants' Further Assurances claims are reserved for further consideration and I will not describe them further in this Memorandum Opinion.

8

I granted Plaintiffs' Motion for Preliminary Injunction on the Restrictive Covenants, discussed above, on August 28, 2015. The Plaintiffs also moved for partial summary judgment on the counts relating to the Customer Payments Claim.[48] In ruling on their Motion for Partial Summary Judgment, I ordered the Defendants to tender the amount of Plaintiffs' funds not in dispute, but reserved decision on the Motion for Partial Summary Judgment pending trial.[49]

The matter was tried March 29, 2016 through March 31, 2016. Post-trial, the Defendants made a Motion for Selection of Independent Accountants to help resolve post-Closing adjustments.[50] I heard argument on this Motion on July 25, 2016 and the parties provided me with a list of conflicted accounting firms on August 1, 2016. What follows is my post-trial Memorandum Opinion addressing the claims over the Restrictive Covenants and the Inventory. Remaining issues shall be referred to a Special Master.

## II. ANALYSIS

### A. Restrictive Covenants

Interpreting the Restrictive Covenants requires examining the term "Business," as defined in the SPA, and a section in the SPA referred to throughout

---

[48] Counts V (Breach of TSA), VI (Breach of the Covenant of Good Faith and Fair Dealing on the TSA), VII (Conversion), and VIII (Unjust Enrichment).

[49] *Brace Indus. Contracting, Inc. v. Peterson Enterprises, Inc.*, 2015 WL 8483170, at *1 (Del. Ch. Dec. 10, 2015).

[50] Mot. for Selection of Ind. Accountants (May 27, 2016) (Dkt. No. 162).

this litigation as a "Carve-Out." The SPA prohibits the Defendants from engaging in the Business in the Territory for five years after Closing.[51] The SPA defines Business as "the turnkey, integrated business of selling and renting industrial and commercial scaffolding and the provision of related design, engineering, erection, dismantling, and jobsite management and maintenance services."[52] The Carve-Out then states:

> [n]otwithstanding the foregoing, (1) Seller may own, directly or indirectly, solely as an investment, securities of any Person traded on any national securities exchange if Seller is not a controlling Person of, or a member of a group which controls, such Person and does not, directly or indirectly, own five percent (5%) or more of any class of securities of such Person, and (2) Vernon L. Goedecke Company, Inc. and its Affiliates may continue to design, engineer, sell and rent scaffolding equipment and other products to participants in the Business in the Territory, provided that Vernon L. Goedecke Company, Inc. and such Affiliates are not allowed to perform the Business in the Territory.[53]

To state the obvious, the language of the Restrictive Covenants is no model of clarity. Reading both provisions in the SPA together, it is simply unclear whether the Restrictive Covenants prohibit the Defendants from renting and selling scaffolding, and the extent that they carve-out the right to rent and sell scaffolding to specific customers. At the preliminary injunctive relief stage, I found, based on the language only, that despite ambiguity the Plaintiffs' construction was reasonably

---

[51] Pretrial Stip. 8; SPA § 5.2(a).
[52] Pretrial Stip. 8; SPA Ex. A.
[53] Pretrial Stip. 8–9; SPA § 5.2(a).

10

likely to succeed. After examining the extrinsic evidence, I find that Defendants' construction is a more reasonable interpretation.

1. The Plaintiffs' Argument

The Plaintiffs contend that the Defendants were breaching the Restrictive Covenants prior to the entry of the preliminary injunction, because the definition of Business includes the phrase "selling and renting industrial and commercial scaffolding" and the Defendants have stipulated to selling and renting scaffolding.[54] According to the Plaintiffs, allowing the Defendants to thus compete with business lines acquired by Brace would "have the practical effect of wiping out the goodwill purchased in the Acquisition."[55]

With regards to the Carve-Out, the Plaintiffs argue, based on the evidence at trial, that this provision was included only to "facilitate Goedecke's rentals of PERI scaffolding to *shoring customers*."[56] The Plaintiffs point out that a portion of Goedecke's business was providing scaffolding to customers who used the scaffolding to hold shoring materials in place on a job site. They argue that the Carve-Out was specifically limited to this business, even though the Carve-Out makes no explicit reference to this shoring-rental business. Specifically, the

---

[54] Pls' Opening Br. 42 (citing Pretrial Stip. 11).
[55] *Id.* at 45.
[56] *Id.* at 46 (emphasis added). This interpretation, to my understanding was not advanced by the Plaintiffs at the Preliminary Injunction Hearing.

Plaintiffs contend that the Carve-Out's phrase "participants in the Business" refers to Goedecke's shoring customers and that it is only these customers to whom Goedecke can continue to sell and rent scaffolding.[57] The Plaintiffs argue that reading the Carve-Out with this intent in mind clarifies the "awkward" use of the phrase "participants in the Business."[58] The only alternative, according to the Plaintiffs, is "that 'participants in the Business' means 'anybody' and entitles [Defendants] to rent and sell scaffolding to anyone," a construction that I found unlikely at the preliminary injunction stage and that the Plaintiffs ask me to reject as absurd.[59]

### 2. The Defendants' Argument

The Defendants emphasize that the "carefully negotiated" conjunctive definition of Business purposefully includes the words "and", "turnkey," and "integrated."[60] Thus, the Defendants contend that the definition of Business only prohibits the Defendants from providing turnkey scaffolding solutions for customers.[61] Further, the Defendants argue that Business "means a scaffolding

---

[57] *See* Pls' Ans. Br. 42; Pls' Opening Br. 47 ("Defendants cannot perform the Business, *i.e.* do things done by a scaffolding company like PIS. But Defendants can interact with participants in the Business to support Goedecke's shoring business.").
[58] *See* Pls' Opening Br. 46–47.
[59] *Id.* at 47.
[60] Defs' Ans. Br. 5–6.
[61] Defs' Opening Br. 7 ("The definition captures turnkey scaffolding solutions and, as used in § 5.2(a), prohibits Defendants from engaging in that activity. It is no more complicated than that.").

subcontractor whose business it is to do *all* of the activities included in the list"[62] and that they have a legal right to "engage in any single activity listed in the definition so long as [they do] not perform all of them."[63] The Defendants point out that Goedecke, a business they retained in the sale, is "a distributor that rents and sells scaffolding to customers who erect and dismantle it themselves."[64] Therefore, according to the Defendants, Geodecke does not engage in the Business and is not in breach of the Restrictive Covenants.[65]

The Defendants argue that the Carve-Out provision was intended to *confirm* that Goedecke could continue to sell or rent scaffolding to anyone "*even* if the customer also buys PIS's turnkey solutions."[66] According to the Defendants, if the parties intended to limit Goedecke to renting and selling scaffolding only to shoring customers, then "the SPA would *in some way* have reflected that understanding."[67] Rather, the Defendants argue that the phrase "participants in the Business" was included because the "Defendants wanted the SPA to state explicitly that Goedecke could rent scaffolding to PIS's customers after Closing."[68] In other words, in Defendants' view, the rental of scaffolding as a stand-alone activity is permitted

---

[62] *Id.* at 8 (emphasis in original).
[63] Defs' Ans. Br. 10–11.
[64] Defs' Opening Br. 6–7.
[65] *See id.* at 7.
[66] *Id.* at 11–12 (emphasis added).
[67] *Id.* at 13 (emphasis in original).
[68] Defs' Ans. Br. 17.

under the Restrictive Covenants, and the purpose of the Carve-Out is to make clear that such rentals are allowed even to "participants in the (turnkey) Business" – that is, PIS customers. The Defendants also argue that to interpret the Carve-Out as limiting Goedecke's sales and rentals to shoring customers would require Goedecke to determine ahead of time whether any given customer intended to use the scaffolding for shoring, which they characterize as unworkable.[69]

### 3. Standard for Contract Interpretation

This Court has recognized that restrictive covenants included in purchase agreements are intended to protect the purchaser in its enjoyment of the business purchased.[70] Delaware law also "more readily enforce[s]" covenants not to compete when they are part of a purchase agreement instead of an employment contract.[71] What I must decide here is the intended meaning of the parties' negotiated definition of Business and the intended scope of the Carve-Out to that definition.

Delaware law requires me to read the contract as a whole.[72] "Delaware law adheres to the objective theory of contracts, *i.e.,* a contract's construction should be

---

[69] Defs' Opening Br. 14.
[70] *Tull v. Turek*, 147 A.2d 658, 662 (Del. 1958) (citations omitted).
[71] *Concord Steel, Inc. v. Wilmington Steel Processing Co.*, 2009 WL 3161643, at *14 n.113 (Del. Ch. Sept. 30, 2009) (citations omitted).
[72] *Salamone v. Gorman*, 106 A.3d 354, 368 (Del. 2014) ("When interpreting a contract, this Court 'will give priority to the parties' intentions as reflected in the four corners of the agreement,' construing the agreement as a whole and giving effect to all its provisions."). (quoting *GMG Capital Inv., LLC. v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 779 (Del. 2012).

14

that which would be understood by an objective, reasonable third party."[73] When the plain meaning of a contract is susceptible to more than one reasonable interpretation, "courts may consider extrinsic evidence to resolve the ambiguity."[74] Specifically for restrictive covenants, "the covenant must be construed, if possible, to determine what was intended by the parties when it was included in the contract. This intent is to be determined in the light of the surrounding facts and circumstances."[75]

### 4. Ambiguity Analysis

Under the SPA, the Defendants may not participate in the Business for five years. The SPA, however, is unclear as to whether Business means performing all of the components listed as an integrated whole, as the Defendants suggest, or whether the performance of any individual component constitutes performance of the Business, as argued by the Plaintiffs. The definition of Business provided begins with "turnkey" and "integrated" which suggests that the parties intended this definition to be limited to activities that encompass *all* of the components that

---

[73] *Id.* at 367–68 (quoting *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1159 (Del. 2010).

[74] *Id.* at 374–75 ("If the contract is ambiguous, a court will apply the parol evidence rule and consider all admissible evidence relating to the objective circumstances surrounding the creation of the contract. Such extrinsic evidence may include overt statements and acts of the parties, the business context, prior dealings between the parties, [and] business custom and usage in the industry. After examining the relevant extrinsic evidence, a court may conclude that, given the extrinsic evidence, only one meaning is objectively reasonable in the circumstances of [the] negotiation.") (citing *In re Mobilactive Media, LLC,* 2013 WL 297950, at *15 (Del. Ch. Jan. 25, 2013) (alternations in original) (citations omitted) (internal quotation marks omitted).

[75] *Tull*, 147 A.2d at 661–62.

follow. However, it is also reasonable to read the provided definition in a "noncombinative" way, to use Defendants' term,[76] and find that Business includes any individual performance of every component in the list provided by the definition.

Further, with regard to the Carve-Out, I have already found its language ambiguous.[77] Since the Preliminary Injunction Hearing I have struggled with the phrase "participants in the Business."[78] As I stated at the Hearing, "participants in the Business" must "mean *something*. It can't just mean 'everybody' because then you wouldn't need the language at all."[79] However, I find PIS's current interpretation unlikely: to interpret "participants in the Business" as limiting Goedecke's sales to shoring customers is simply unexpressed in the provision itself. The language of the Restrictive Covenants does not clearly convey the parties' intent and is "susceptible to more than one reasonable interpretation."[80] Thus, I find that the Restrictive Covenants are ambiguous and turn to considering the relevant extrinsic evidence offered by both parties.

5. Extrinsic Evidence

    a. The Definition of Business

---

[76] Defs' Opening Br. 7.
[77] *Brace*, 2015 WL 5097240, at *2.
[78] Prelim. Inj. Hr'g Tr. 46:1–3.
[79] *Id.*
[80] *Salamone*, 106 A.3d at 374.

The Plaintiffs argue that Business was "intended to mean the business purchased by Brace," which was PIS.[81]  PIS, the Plaintiffs argue, is not limited to turnkey projects, but includes other components of turnkey projects as well, including rentals of scaffolding.[82]  According to the Plaintiffs, "Brace would have never consummated the Acquisition if the Restrictive Covenants permitted Defendants to compete with PIS."[83]  The Plaintiffs also contend that the Defendants admit that they are prohibited from the business of E&D (erection and dismantling), which the Plaintiffs argue is but one component of a turnkey project, thus contradicting the idea that the Defendants can compete on any component in the definition of "Business."[84]  Further, the Plaintiffs point to testimony by Ron Peterson, PEI's CEO and lead negotiator for the sale of PIS,[85] to argue that the Defendants understood there to be a difference between E&D and a turnkey project.[86]  In other words, according to the Plaintiffs, their explanation for the scope of the Restrictive Covenants—prohibiting Goedecke from competing in the turnkey business or *any component thereof*—is bolstered by Defendants' admission that the

---

[81] Pls' Opening Br. 42.
[82] Pls' Ans. Br. 38.
[83] *Id.* at 44.
[84] *Id.* at 39.
[85] Defs' Opening Br. 2.
[86] Pls' Ans. Br. 40 (citing Trial Tr. 445:4–7 "Q. So, essentially, a turnkey project is one that includes E&D and rentals.  Is that how you would describe a turnkey project? A. Yes, I would say so.").

Restrictive Covenant prohibits E&D, which is but a component of the turnkey business.

The Defendants argue that "E&D" is industry shorthand for turnkey scaffolding projects.[87] The Defendants present both Ron and Eric Peterson's testimony stating "E&D generally I think of as turnkey projects" and "[a]gain, turnkey, integrated, E&D business, it's generic terms, but, yeah, it basically means that you're doing a job end to end; you're designing it, you bid it, you install the scaffolding, you rent it for a while, and you tear it down, and you go to the next job."[88] Additionally, the Defendants argue that the testimony of Ron Peterson was "wholly consistent with the plain reading of the Business definition" in that he understood "we're not allowed to go out and do E&D work."[89]

The Defendants also argue that a series of e-mails exchanged between the parties while drafting the SPA supports an integrated reading of the Business definition.[90] The Defendants first cite a Ron Peterson e-mail to Brace stating "[y]ou are buying our domestic scaffolding E&D (erection and dismantling) business."[91] Next, the Defendants cite an e-mail exchange between PEI's counsel and Brace's

---

[87] Defs' Ans. Br. 8.

[88] *Id.* at 8 (citing Trial Tr. 444:8–9; 567:9–21). The Plaintiffs point out that testimony by Ron and Eric Peterson is self-serving.

[89] Defs' Opening Br. 7 (citing Trial Tr. 449:23–450:4 "There's a definition for Capital B, Business, in the back. I'm stating the obvious here. Then that's saying we can't get out – we're not allowed to go out and do E&D work, erection and dismantling work.").

[90] *Id.* at 16.

[91] *Id.*

18

counsel, in which PEI's counsel referenced the last draft of the SPA's definition of Business and wrote "[t]he concept being that the Business is a turnkey erection and dismantling scaffolding operation."[92] Brace's attorney responded by rejecting PEI counsel's comment and writing "we need to stay with our definition" and that PEI counsel's language was "too restrictive and narrow."[93] However, Brace's counsel added that "if Ron [Peterson] wants to continue to sell or rent scaffolding *without any further activity*, that's fine."[94] PEI's counsel then responded by writing:

> We are not trying to get back into the *E&D business of scaffolding* by our suggested definition. However, the definition you have proposed is too restrictive on Goedecke's current business. This concept was clearly negotiated and agreed upon that the company we are selling (Peterson Ind Scaff) is the *erecting and dismantling portion of the business*. The definition you have proposed is restrictive to Goedecke performing its normal course of business and we do not want to be in breach of contract for doing what we've agreed to be allowed to do. Wording of the definition needs to be altered to allow Goedecke to continue operating as we have agreed.[95]

The Defendants then point to Vrettakos' deposition testimony that he understood the e-mail from Brace's counsel as saying "it's okay if Goedecke wants to continue to sell or rent scaffolding so long as there's no erection and dismantling."[96] The parties ultimately agreed to Defendants' integrated language.[97]

---

[92] *Id.* at 17.
[93] *Id.*
[94] *Id.* (emphasis added) (The Defendants note that the reference to Ron Peterson here is a reference to Goedecke).
[95] *Id.* at 17–18 (emphasis added).
[96] *Id.* at 18 (citing Vrettakos Dep. Tr. 63:1–5).
[97] *See id.* at 19–20; JX 22, 32, 34 (showing updated versions of the SPA).

19

b.  The "Carve-Out"

The Plaintiffs argue that the scope of the Restrictive Covenants was settled in a May 7, 2014 e-mail between Eric Peterson, PEI's COO,[98] and Craig Kaple, Brace's COO.[99]  In this e-mail, Kaple acknowledged that the parties were "in agreement that Brace can rent or sell scaffolding to a client as a standalone transaction" and went on to state that Goedecke could perform its "normal sale or rental of scaffolding to their customers" but could not "erect or dismantle scaffolding."[100]  Obviously, this e-mail strongly supports Defendants' proposed construction of the Carve-Out.  The Plaintiffs, however, argue that the phrase "their customers," with respect to Goedecke, meant shoring customers only, and that both Hans Petter Hansen, Brace's former CEO and lead negotiator for the purchase of PIS,[101] and Pete Vrettakos, Brace's former Chairman,[102] understood this as well.[103]  As additional evidence of restricting Goedecke's sales and rentals to only shoring customers, the Plaintiffs argue that they were told by Eric Peterson in March 2014 that the Defendants "were going to keep $250k of material to support their shoring."[104]  Additionally, the

---

[98] *Id.* at 2.

[99] Pretrial Stip. 6; Pls' Opening Br. 13.

[100] *See* Pls' Opening Br. 14; Pls' Ans. Br. 44 ("[T]he parties agreed that 'Brace can rent or sell scaffolding to a client as a standalone transaction. Goedecke can also do there [sic] normal sale or rental of scaffolding to their customers.'").

[101] Pretrial Stip. 6.

[102] *Id.*

[103] *See* Pls' Opening Br. 14 (citing Trial Tr. 42:18–22; Vrettakos Dep. Tr. 60:12–25); Pls' Opening Br. 47–48 (citing Trial Tr. 38:8–39:11, 69:12-18; Vrettakos Dep. Tr. 37:13–16).

[104] Pls' Ans. Br. 47; JX 15.

Plaintiffs cite the testimony of their lead SPA negotiators to argue that the Carve-Out was intended to limit Goedecke to renting scaffolding to shoring customers.[105]

The Defendants cite Eric Peterson's testimony to argue that the Carve-Out was intended as confirming language.[106] The Defendants also point to Ron Peterson's testimony at trial that the Plaintiffs developed their "concept of limiting Goedecke's scaffolding sales and rentals to shoring customers . . . [only] after the lawsuit."[107] Most prominently, the Defendants point to the May 7, 2014 e-mail as "perhaps the clearest indication of the parties' mutual understanding."[108] According to the Defendants, this e-mail was sent by Kaple to Hansen, Vrettakos, and Brace's lead counsel relaying a conversation Kaple had with Eric Peterson earlier in the morning.[109] In the e-mail, as discussed above, Kaple states "Goedecke can also do there [sic] normal sale or rental of scaffolding to their customers" but the Defendants emphasize that Kaple goes on to write in the following sentence that "Goedecke can't *erect or dismantle* scaffolding."[110] Additionally, the Defendants contend that "their customers" did not mean only "shoring customers" but also Goedecke's other

---

[105] *Id.* at 42. (citing Trial Tr. 38:8–39:11, 69:12–18; Vrettakos Dep. Tr. 37:13–16).
[106] Defs' Ans. Br. 15 (citing Trial Tr. 518:24–519:4 "We didn't want to trip up, and specifically we didn't want to trip up with any situation where Peterson Industrial Scaffolding had some direct rental or rental only and trying to claim that we were in breach of the agreement on that.").
[107] Defs' Opening Br. 14 (citing Trial Tr. 435:9–13).
[108] *Id.* at 18.
[109] *Id.*
[110] *Id.* at 18–19 (emphasis added).

21

customers who rented scaffolding for purposes other than shoring.[111] Moreover, the Defendants argue that "[e]ven if the phrase 'participants in the Business' is ambiguous, that does not give Brace license to give it a meaning [shoring customers] nowhere even suggested in the SPA or by the parties during negotiations."[112] Finally, both parties point to record evidence to argue that post-Closing conduct supports their position.[113] I have considered this post-Closing evidence but I do not find it convincing.

6. Extrinsic Evidence Analysis

In attempting to harmonize the competing extrinsic evidence offered by both sides, I find that the Restrictive Covenants do not limit Defendants' participation in the business of renting and selling scaffolding, separate from E&D. I find that the more intuitive construction, as supplemented by the extrinsic evidence, lies with Defendants' interpretation. First, I note that the Restrictive Covenant language is more readily understood to prohibit only "turnkey" competition, and not components thereof. Second, while I will not address each item of extrinsic evidence piece by piece, I find that Defendants' testimony regarding their understanding of E&D as representing turnkey, end-to-end projects and the e-mails exchanged during the SPA's drafting in particular shift the ledger further in Defendants' favor. Also, in

---

[111] Defs' Ans. Br. 17–18.
[112] Defs' Opening Br. 14.
[113] *See* Pls' Opening Br. 48; Defs' Opening Br. 15, 20; Defs' Ans. Br. 19.

examining the drafting history of the SPA, it is clear that the Plaintiffs deleted "turnkey, integrated business" but then later accepted Defendants' revisions re-inserting the "turnkey, integrated business" language.[114] Therefore, it would be difficult for me to conclude that the Plaintiffs were not aware of Defendants' intent to limit the definition of Business to turnkey projects only. Turning to the Carve-Out, I am convinced by Defendants' argument that, if the Carve-Out was indeed intended to limit Goedecke to renting and selling to shoring customers only, it would likely have explicitly reflected that intent. In other words, the Defendants' is the more reasonable construction here: the intent of the Carve-Out was to confirm that rentals may be made even to PIS customers. Accordingly, I find that the more reasonable definition of Business as intended by the parties is a "turnkey," "integrated" business that leaves Defendants free to rent and sell scaffolding. Additionally, I find that the Carve-Out provision was not intended to limit Goedecke to renting and selling to only shoring customers. Considering their contract as a whole, including extrinsic evidence, Defendants' construction is the more likely.

Because my finding here demonstrates that the preliminary injunction was improvidently entered, the Defendants are entitled for losses they incurred therefrom up to the posted bond of $250,000. The parties should consult to decide whether

---

[114] *See* JX 22, 32, 34 (showing updated versions of the SPA).

they can agree to the amount of loss or whether they require further judicial assistance.

## B. Inventory Claims

The Plaintiffs argue that they did not receive the scaffolding assets promised to them in the SPA, ultimately resulting in total damages of $1,253,040.[115] Specifically, the Plaintiffs argue that they were shorted PERI Items and Board Items[116] and that they were forced to rent equipment because of the shortages.[117] The Plaintiffs also argue in the alternative that the Defendants committed fraud.[118]

Section 3.11(b) of the SPA required the Defendants to disclose the inventory equipment they would convey to Brace as part of the Acquisition.[119] The Defendants disclosed a detailed list,[120] which I have referred to as the Scaffolding List. The Defendants warranted to its accuracy in Section 3.11(b) of the SPA and agreed to indemnify the Plaintiffs for any shortages.[121] SPA Section 3.11(b) provides:

> Section 3.11(b) of the Disclosure Schedules sets forth a true, correct and complete list and general description of substantially all furniture, fixtures, equipment, machinery, tools, vehicles, office equipment, supplies, computers, telephones and other tangible personal property of the Company or used solely in the Business and not by the Seller for other purposes in connection with any Affiliates (the "Tangible

---

[115] *See* Pls' Opening Br. 1, 27; Defs' Opening Br. 30–31.
[116] "PERI Items" are components used to construct custom scaffolding; "Board Items" are planks used to make a workable surface on the scaffolding.
[117] Pls' Opening Br. 27.
[118] *Id.* at 32.
[119] SPA § 3.11(b).
[120] *See* JX 71.
[121] Pretrial Stip. 7; SPA § 3.11(b).

Personal Property"); provided, the Company also regularly uses rented equipment from PERI USA, PERI Canada, and other third-parties for which the Company has no ownership claim.[122]

As further protection for the Plaintiffs, ten percent ($1.87 million) of the purchase price was placed into escrow at Wilmington Trust that would be released in two equal distributions on April 1, 2015 and February 1, 2016 if there were no claims for indemnification.[123] On March 26, 2015, the Plaintiffs made a claim against the escrowed funds, alleging that they had not received all the inventory called for in the Scaffolding List. They seek indemnification under the SPA for that shortfall in this action. For the reasons that follow, I find that the Plaintiffs prevail on their claim for a shortage of PERI Items and Board Items. However, I find that the Plaintiffs fail on their claim to recover rental expenses and have also failed to prove fraud.[124]

1. Procedural Requirements under the SPA

The Defendants point to what they allege are deficiencies in the notice of claims for inventory shortages, and suggest that, as a result, Plaintiffs' claims are

---

[122] SPA § 3.11(b).

[123] Pretrial Stip. 10. *See* Escrow Agreement 1.3(c), 1.4(a), 1.5(a).

[124] The Plaintiffs argue that I should exclude the opinion stated by Defendants' expert, John Placht, because it is not based on scientific methodology, that the inventory claims require expert testimony, and that their expert's testimony is thus the sole evidence admissible. I must, according to the Plaintiffs, find in their favor, therefore. The Defendants counter that Plaintiffs' Inventory Claims do not require expert testimony and are "readily understandable." Given my decision, *infra*, I do not need to address this argument further with respect to the inventory claims. Placht's opinion with respect to Defendants' "offset" claims is discussed, *infra*.

unenforceable. I disagree. Section 6.10 of the SPA provides that the indemnification procedure under Article VI of the SPA is the "sole and exclusive remedy" for all claims, excluding fraud, for any breach of a representation or warranty.[125] Section 6.5(c) provides that in asserting a Direct Claim, the Indemnified Party shall give "reasonably prompt written notice" and that "[s]uch notice . . . shall include copies of all material written evidence." Nonetheless, Section 6.5(c) also states "[t]he failure to give such prompt written notice shall not, however, relieve the Indemnifying Party of its indemnification obligations, except and only to the extent that the Indemnifying Party forfeits rights or defenses by reason of such failure."[126] Even assuming that the Plaintiffs failed to give prompt written notice by failing to provide material written evidence, the Defendants here have not forfeited any rights or defenses by reason of that failure. Thus, I find that Plaintiffs' indemnification claim is not barred procedurally under Section 6.5(c) of the SPA.[127]

2. PERI Items

---

[125] SPA § 6.10.

[126] *Id.* § 6.5(c).

[127] On another procedural note, the Defendants argue that if the Plaintiffs had factored in the receipt of overages, discussed below, then their damages claim would be below the $300,000 "basket amount" provided for in Section 6.4(a) of the SPA. Since I find below that the Plaintiffs are entitled to their claim for $703,975, the Plaintiffs are already well above the $300,000 basket provided for in Section 6.4(a) of the SPA. Thus, the parties' arguments with respect to that section are now moot.

A physical count of the scaffolding items, particularly the PERI items,[128] is not reasonably possible. The testimony shows that the hundreds of thousands of scaffolding fittings scattered across many job sites makes a physical inventory inefficient and unreliable.[129] The parties each suggest an alternative method for tracking inventory and determining the amount of scaffolding equipment conveyed to the Plaintiffs at Closing: Plaintiffs' "Mary Sheet Analysis"[130] and Defendants' "FACTS"-based inventory system.

### a. The Mary Sheet Analysis

The Mary Sheet Analysis, conducted by Plaintiffs' expert Steven Kops, consists of "comparing the disclosed amount of each PERI Item on the Scaffolding List with the maximum amount of those items that Defendants could have possessed" based upon Defendants' purchase records.[131] This maximum amount was determined by first calculating the aggregate amount of items PEI has historically purchased, using the "Mary Sheet" (a list of items purchased for PIS), and then subtracting out items that Kops determined had been shipped to Africa and were thus unavailable for transfer under the SPA.[132] Shortages were then determined

---

[128] I use the term "PERI Items" as shorthand for scaffolding items in question, most or all of which are PERI brand.

[129] *See* Trial Tr. 98:24–99:14.

[130] The "Mary Sheet" represented the historical purchases of PERI inventory, as kept by "Mary," an employee of the Defendants. Trial Tr. 254:1–3.

[131] Pls' Opening Br. 26.

[132] *See* Trial Tr. 257:22–260:22. The Defendants argue that the Plaintiffs determined that more equipment was sent to Africa than was actually the case, but I am not convinced, nor, to my mind,

to exist where the inventory promised via the Scaffolding List exceeded the maximum amount that the Defendants could have transferred at Closing.[133]  In other words, if the Scaffolding List disclosed twenty units of Item X, but the Mary Sheet Analysis showed that the maximum amount the Defendants could have possessed was only fifteen units, Kops would conclude that the Plaintiffs had been shorted five units of Item X.  According to Kops, "[t]he logic is that you can't convey or sell an item that you don't own or possess."[134]

  b. The "FACTS System"

The Defendants use software called "FACTS" to track their scaffolding equipment.[135]  FACTS is a perpetual inventory system, which requires the accurate inputting of ship tickets and return tickets to allow the software to create a running list of inventory.[136]  A yearly physical count at random locations of random items was conducted by third-party auditors as a check to the inventory of the FACTS system.[137]  To create the Scaffolding List, Eric Peterson, along with Mark Talley,

---

is there a more reasonable method of determining the amount of equipment that was sent to Africa. The items shipped to Africa were identifiable by specific shipping order numbers. Trial Tr. 258:1–18.  Moreover, Mark Talley, whose testimony I discuss below, testified that there was an easy dividing line between North America equipment and Africa equipment and that "all but four loads of the material" went to Africa.  Trial Tr. 97:16–98:3.

[133] Trial Tr. 260:4–22.

[134] *Id.* at 262:23–24.

[135] *Id.* at 97:10–11.

[136] *Id.* at 97:10–15; 472:4–8.

[137] *See Id.* at 472:9–475:3.

completed a final check of ship and receive tickets and then exported the inventory data from FACTS to create the List.[138]

### c. The Trial Testimony Indicates that the Mary Sheet Analysis is Likely More Reliable than the FACTS System

I find that the Mary Sheet Analysis is the more reasonable method to establish the amount of scaffolding conveyed at Closing. I note that the Mary Sheet Analysis is inherently conservative; it might overstate the amount of inventory transferred, but logically it cannot understate it; the Plaintiffs have shown the maximum amount of scaffolding the Defendants could have had on hand, counted that as what was transferred, and any shortage by comparison to the Scaffolding List indicates the *minimum* amount of shortage in the items conveyed. The shortage could be greater, but the Defendants have failed to show that the shortages are not at least as much as the shortages found to exist by the Mary Sheet Analysis. The Defendants point out that the method is subject to categorization errors; that purchase records may not be infallible and item codes may "sometimes" be collapsed into one code for tracking purposes, leading to inaccuracies in the inventory on hand.[139] Nonetheless, I find that, in light of the lack of a reliable physical inventory, the Mary Sheet Analysis presents the best method available to quantify the inventory transferred, and that it

---

[138] *Id.* at 485:1–16; 587:5–14.
[139] *Id.* at 511:24–512:9.

is more likely than not that the shortage stated under Plaintiffs' analysis is less than or equal to the actual shortage.

By contrast, the Defendants advance the FACTS system, the same mix of shipping receipts, third-party auditors, computer software, and physical counts they used to produce the Scaffolding List itself. In rejecting the accuracy of the FACTS system, I am persuaded by the testimony of Talley. Talley has been in the scaffolding business since 1978 and worked for the Defendants before transferring over to the Plaintiffs as a "key man" on the sell side of the transaction.[140] Talley has been involved in a majority of scaffolding purchases by PIS.[141]

Talley explained that there were many problems with the inventory in FACTS before the sale.[142] Inventories were taken in November of 2013 and July of 2014, both of which Talley describes as "junk."[143] Talley testified to the difficulties of getting all of the ship tickets in and out correctly and that "paper would get lost," causing the resulting inventory to be unreliable.[144] With regards to field audits of job sites, Talley discussed their extreme difficulty, explaining as an example that "everyone in the room would go count [the inventory], and all come up with a different number because we'll miss this corner or we'll miss this piece."[145]

---

[140] *Id.* at 83:5–84:21.
[141] *See id.* at 86:23–87:20.
[142] *Id.* at 98:4–13.
[143] *Id.* at 98:3–13. I note that the parties entered into the SPA on August 10, 2014.
[144] *See id.* at 98:6–99:24.
[145] *Id.* at 98:20–99:16.

According to Talley, such physical counts were attempted three different times with no success.[146] Ultimately, Talley concluded that the Scaffolding List was not accurate because after having problems with the inventory for nine months, those problems did not "miraculously get fixed" shortly before Closing, when the Scaffolding List was created from the inherently-inaccurate FACTS-based inventory.[147] Talley has provided testimony favorable to both sides in this matter, and—in light of the fact that his personal monetary interests lie contrary to Plaintiffs' interests in the matter of the inventory claims[148]—I find him to be a particularly credible witness.[149] Such a conclusion is further enhanced by contrasting Talley's testimony with that of Eric Peterson, PEI's COO and a named Defendant in this case,[150] which testimony the Defendants primarily rely on to establish the accuracy of the FACTS System.[151]

A portion of Eric Peterson's trial testimony under cross examination illustrates the problematic nature of Defendants' method. When shown a balance sheet that went into the SPA, Eric Peterson noticed a July pro forma adjustment that

---

[146] *Id.*
[147] *See id.* at 109:23–110:21.
[148] Talley is entitled to cash based on both the escrow and working capital adjustment. If the escrow is released in its entirety, he would receive $230,000. He is liable for up to $135,000 of any indemnification owed to the Plaintiffs. Trial Tr. 85:22–86:12; Separation Agreement § 1.2
[149] *Id.* at 86:1–86:12.
[150] Along with his father, Ron Peterson, who through the Guaranty is personally liable for indemnifying the Plaintiffs. *See* Pretrial Stip. 5, 7.
[151] *Id.* at 472–478.

he did not recognize.[152] Explaining that he would not have provided a balance sheet with a July pro forma adjustment, Eric Peterson concluded that the balance sheet was a due diligence estimate created by *Brace*. Most damaging, to my mind, Eric Peterson then explained that "we may have used it in the disclosure for simplicity because of all the disclosures we were putting together" and that he believed "in the *flurry of activity* going on . . . [it] is very likely that we just grabbed the latest one that they had . . . ."[153] While this is only one example, this testimony does not assuage my concerns about the reliability of Defendants' method for tracking inventory and creating the Scaffolding List. In short, I find that the Defendants were unable to create a reliable inventory in reliance on the FACTS software and their methodology, and that their computation of the inventory transferred under the SPA is unreliable.

Having found that the Mary Sheet Analysis is the more reasonable method of tracking the scaffolding equipment, the question arises of whether any shortages shown by the Mary Sheet Analysis should be offset by items that, based on that analysis, should have been on hand and transferred by the Defendants to the Plaintiffs, but were not on the Scaffolding list. The Defendants argue that in cases

---

[152] *Id.* at 582:22–584:23.

[153] *Id.* at 582:22–586:5 (emphasis added). To quote Eric Peterson's statement in full: "I believe in the flurry of activity going on that—I don't even remember sending a balance sheet or anything in, so this is very likely that we just grabbed the latest one that they had and said let's use the financials that you got in your—I think this was from the due diligence process which happened to be Brace's." *Id.* at 585:20–586:2.

32

where the amount of particular scaffolding items disclosed on the Scaffolding List is *less* than the amount called for by the Mary Sheet Analysis, this would mean that the Plaintiffs actually received *more* of that item than was represented in the Scaffolding List, resulting in an overage.[154] Talley testified on cross examination to "at least once" counting more equipment on hand than called for by the Mary Sheet Analysis, when the Plaintiffs were still attempting to do a physical inventory.[155] The Defendants claim the total value of these "overages" amounts to $983,004, which, they argue, in equity should be offset against the value of the shortages.[156] The Defendants have not shown that these items were actually transferred, and I decline to offset the inventory shortages for three reasons. First, as noted above, the Mary Sheet Analysis shows the maximum transferred—it thus gives the defendants credit for items that may have been lost, stolen or worn out and discarded. This is the rationale used by Plaintiffs' expert, Kops, in explaining why items shown on the Mary Sheet were not included on the Scaffolding List.[157] At the least, such attrition to the list of inventory purchased logically accounts for some, if not all, of any overstatement of scaffolding available for transfer according to the Mary Sheet Analysis. Second, the items that the Defendants were contractually bound to transfer

---

[154] Defs' Opening Br. 31. In other words, the Defendants argue an overage results if the Scaffolding List disclosed a lesser number than the maximum amount the Defendants could have had on hand according to the Mary Sheet Analysis.

[155] *See* Trial Tr. 157:4–158:3.

[156] Defs' Opening Br. 32 (citing Trial Tr. 338:3–17).

[157] Trial Tr. 333:2–334:1.

were those listed on their own inventory, and to the extent uncertainty exists, it is because of the lack of precision in that inventory, for which they should bear the loss. Finally, it is not clear from the record that overages, if any, have value to the Plaintiffs; the scaffolding inventory consists of fittings used to construct a custom scaffolding layout, and the record does not allow me to know whether any overages complement the fittings that the Plaintiffs did receive so as to be of value to the Plaintiffs. In other words, I accept Plaintiffs' logic that the total number of scaffolding items received is less important than the ratio of specific items, as the items "are not necessarily interchangeable" from one scaffolding "set" to another.[158]

For all these reasons, the Defendants have failed to show that the shortfall indicated by the Mary Sheet Analysis must be offset by potential overages suggested by that analysis.

3. Indemnification Amount

   a. *Replacement Cost*

Kops calculated the replacement cost for each shorted item by using PEI's historical purchases and multiplying the shorted amount for each item by the average cost of that respective item.[159] I find this to be the appropriate method to calculate

---

[158] *See* Pls' Opening Br. 10 (citing Trial Tr. 122:9–21, 125:6–24).
[159] Trial Tr. 261:8–262:3.

indemnifiable loss due to inaccuracies in the Scaffolding List.   Under this method, the Mary Sheet Analysis resulted in a total shortage amount of $703,975.[160]

### b.  Rental Expenses

In addition to the value of the inventory shortages under the Mary Sheet Analysis, the Plaintiffs argue that they are entitled to $527,981 they incurred in rental costs.[161]  The SPA provides that the Business transferred uses rental scaffolding in addition to scaffolding in inventory,[162] and the Plaintiffs calculate that they rented more than half a million dollars of additional scaffolding due to the shortage, to complete jobs during the pendency of this action.  The Defendants argue that these rental costs constitute consequential damages, and point out that recovery of such damages is specifically excluded under Section 6.4(e) of the SPA.[163]  "Consequential damages" is not a defined term under the SPA, and I rely on the definition in Black's Law Dictionary, which defines consequential damages as "[l]osses that do not flow directly and immediately from an injurious act but that result indirectly from the act."[164]  That is precisely what the Plaintiffs seek here—the indemnification amount set out above (with interest running from the breach) makes them whole for the

---

[160] *Id.* at 262:1–3.
[161] Pls' Opening Br. 27.
[162] SPA § 3.11(b)
[163] *See* Defs' Opening Br. 45, SPA § 6.4(e) ("Except to the extent that an Indemnified Party pays (or becomes obligated to pay) such damages in connection with a Third Party Claim, no Indemnifying Party [will] be liable to any Indemnified Party for any punitive, incidental or consequential damages.").
[164] *See* Defs' Opening Br. 45–46; *Damages*, Black's Law Dictionary (10th ed. 2014).

shortfall between what the Defendants promised and the Plaintiffs received. Plaintiffs' choice to use extra rental components on particular jobs—rather than purchasing items—led to consequential, not direct or expectation, damages. The parties agreed to exclude claims for such damages from recovery by indemnification, accordingly, I find that Plaintiffs' claims for rental damages over and above the replacement cost of inventory shortages are barred under SPA Section 6.4(e).

### 4. Board Items

The term "Board Items" simply refers to planks used with the scaffolding equipment. The Plaintiffs briefly allege that they received less Board Items than the number disclosed on the Scaffolding List, amounting to indemnification worth $21,084.[165] The Defendants do not dispute this amount, but state that a scrivener's error resulted in the omission from the SPA of the parties' agreement that the Defendants were going to keep some of the Board Items.[166] The Defendants do not seek reformation of the SPA on this ground, however. Accordingly, I find that the Plaintiffs may recover $21,084 in damages resulting from the shortage of Board Items, in addition to the PERI scaffolding shortage quantified above.

### 5. Fraud

---

[165] Pls' Opening Br. 27 (citing Trial Tr. 267:22–24).
[166] Defs' Ans. Br. 26.

36

The Plaintiffs argue that Defendants' misrepresentation of the scaffolding inventory transferred constitutes fraud.[167] This argument was made in the alternative, and is likely moot given my decision above. In any event, the Plaintiffs have failed to meet their burden of proving scienter, which is necessary to establish common-law fraud.[168] In other words, the Plaintiffs have not shown that the Defendants acted with knowledge or belief that the representation was false, or that it was made with reckless indifference to the truth, in order to deceive the Plaintiffs. The Plaintiffs allege that Eric Peterson created the Scaffolding List using FACTS data that he should have known was inaccurate, and thus acted with the requisite falsity or reckless indifference to the truth, in an attempt to mislead the Plaintiffs.[169] However, the contract among the parties recognized that the Disclosure Schedules, including the Scaffolding List, might contain inaccuracies, and provided a method to redress them together with an escrow of funds to provide a remedy. Given this factual and contractual scenario, the Plaintiffs have failed to demonstrate scienter.

---

[167] Pls' Opening Br. 32.

[168] A finding of fraud requires the Plaintiffs prove "(1) a false representation, usually one of fact, made by the defendant; (2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; (3) an intent to induce the plaintiff to act or to refrain from acting; (4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and (5) damage to the plaintiff as a result of such reliance." *Gryzbowski v. Tracy*, 2013 WL 4053515, at *4 (Del. Ch. Aug. 9, 2013).

[169] Citing Talley's testimony, the Plaintiffs argue that Eric Peterson knew FACTS was inaccurate but still used it to create the Scaffolding List, which he created as an "afterthought." The Defendants counter that Eric Peterson exported the FACTS data to an Excel Sheet as an "afterthought," but spent ample time actually verifying the data in FACTS. Pls' Opening Br. 12; Defs' Ans. Br. 33 n.19.

Finally, with respect to Plaintiffs' suggestion that an equitable fraud analysis should apply in this case, the Plaintiffs are correct that equitable fraud does not require proof of scienter.[170] However, equitable fraud does require a special relationship, typically a fiduciary relationship, between the plaintiff and the defendant.[171] No such fiduciary relationship exists between these contracting parties. Thus, I find that the Plaintiffs have failed to prove both fraud and equitable fraud.

## C. *Attorneys' Fees*

The parties seek attorneys' fees and costs incurred in pursuing their claims, under various theories. In particular, the Plaintiffs argue that Defendants' withholding of sums collected on behalf of the Plaintiffs as part of their servicing obligations under the TSA amounts to wrongful self-help, and that Plaintiffs' attorneys' fees in connection with this Customer Payments Claim—which is itself subsumed within the truing up of accounts among the parties that will be addressed by a Special Master, as discussed below—must be shifted onto the Defendants under the bad-faith exception to the American rule on legal fees. Consideration of fees shall await resolution of the remaining issues in this case.

## D. *Remaining Issues*

---

[170] *Grzybowski*, 2013 WL 4053515, at *6 n.49 (citations omitted).
[171] *See id.* at *6 n.49; *In re Wayport, Inc. Litig.*, 76 A.3d 296, 327 (Del. Ch. 2013).

38

Other issues remain in this case, these include, *inter alia*, Plaintiffs' claim that Defendants usurped Customer Payments owed to them under the TSA, Defendants' proposed offsets to those claims arising from allegations over post-Close transactions, and disputes over working capital adjustments.

Section 2.4(c)(3) of the SPA requires any disputes surrounding Post-Closing Adjustments to be submitted to Deloitte LLP.[172] Unfortunately, according to the parties, Deloitte has a conflict and cannot serve in this capacity. In such a case, Section 2.4(c)(3) provides that both parties should select an "impartial nationally recognized firm of independent certified public accountants."[173] The parties have been unable to agree on an independent accountant.

It appears to me that these remaining issues—which essentially amount to an accounting among the parties—are largely computational in nature. Thus, for purposes of efficiency, I am appointing Stephen Brauerman, Esquire, as Special Master to serve the parties in their remaining disputes in this matter. Mr. Brauerman shall select the accountant called for under Section 2.4(c)(3), and may rely on that accountant to assist in the resolution of other remaining issues, as well. The parties should confer and agree to a script to inform the Special Master as to his duties. To the extent any party believes that any matter requires judicial attention outside of the

---

[172] *Id.* § 2.4(c)(3).
[173] *Id.*

39

special master process, the party should so notify me. Any such issues will be resolved promptly before submission of the matter to the Master. In particular, the Plaintiffs argue that certain of Defendants' claims in offset to Plaintiffs' retained-payments claim must be excluded, because those claims require expert testimony, which the Defendants failed to provide. It is not my intention to submit this issue to the Master, and the parties should clarify what legal issues remain concerning the offsets before submission of the matter to Mr. Brauerman.

### III. CONCLUSION

For the foregoing reasons, I find that the Defendants are not in breach of the Restrictive Covenants in the SPA. I lift the preliminary injunction I ordered in my Letter Opinion on August 28, 2015.

Additionally, I find that the Plaintiffs are entitled to $703,975 to indemnify them for the shortage of PERI Items and $21,084 for the shortage of Board Items, for a total indemnification award of $725,059, together with interest. I find that the Plaintiffs are not entitled to recover rental costs. Finally, I find that the Plaintiffs have failed to show that the Defendants committed fraud. The parties should supply an appropriate form of order.